IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AG SERVICES OF AMERICA, INC.,
an Iowa corporation,

        Plaintiff,

vs.                                                        No. CIV 96-1637 JC/WWD

JOHN D. NIELSEN, a/k/a JACK
NIELSEN, DIAMOND HILL FARMS,
CLOVIS, INC., a New Mexico corporation,

        Defendants.

## THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Findings of Fact

1. The Plaintiff, Ag Services, is an Iowa corporation with its principal place of business located in Cedar Falls, Iowa.

2. The defendant, John D. Nielsen, a/k/a, Jack Nielsen ("Nielsen"), is a resident of the State of Nebraska. Defendant John D. Nielsen has conducted most of his business as a proprietorship under the trade name Diamond Hill Farms.

3. On or about August 16, 1991, Terry Lundell ("Lundell"), for adequate consideration, made, executed, and delivered to Ag Services a master Promissory Note in the original maximum amount of $600,000.00 (the "Note"), for the purpose of financing the sale of agricultural inputs to Lundell by Ag Services and cash advances made to Lundell by Ag Services necessary to carry out Lundell's New Mexico farming operations, and that the Note was subsequently amended by an

1

Agreement to Supplement Promissory Note on or about January 13, 1992, to increase the maximum amount under the Note to $800,000.00. The amount actually loaned to Lundell was $787,979.22.

    4. In order to secure the $800,000.00 Note, Lundell made, executed and delivered to Ag Services two Agricultural Security Agreements. Pursuant to the terms of said agreements, Lundell pledged to Ag Services a security interest in, among other things, all growing crops, harvested crops, inventory, account receivables, contract rights, general intangibles, farm products, seed, fertilizer, chemicals and inputs grown on the farm.

    5. Ag Services filed financing statements and amendments thereto with the County Recorder Offices in, among others, Curry and Roosevelt Counties, New Mexico, on September 24, 1991 and September 3, 1992. On or about September 24, 1991, Ag Services filed an Effective Financing Statement ("EFS") with the office of the Secretary of the State of New Mexico, covering wheat, potatoes and corn grown by Lundell in Curry and Roosevelt Counties, New Mexico, for the 1992 crop year. The description of collateral contained in the financing statements and effective financing statement was adequate to place third parties, including defendants, on notice that Ag Services had claimed a security interest in all of Lundell's crops grown in 1992 in Curry County or Roosevelt County, New Mexico, including his potatoes, grown potatoes, harvested potatoes and in all seed potatoes, chemicals, fertilizers, and other farm supplies, and in all of the proceeds received from the potatoes. On or about July 10, 1992, Lundell executed a First Amendment to Agricultural Security Agreement which supplemented the legal description of real estate. Ag Services filed amended financing statements on September 3, 1992 with the County Recorder Offices in Curry and Roosevelt Counties, New Mexico. The

Note provides that all payments under the Note are to be made to Ag Services at Post Office Box 668, Cedar Falls, Iowa 50613.

6. On or about December 30, 1991, Lundell executed a Farm Lease Agreement with Jeffrey M. Jorde, Sandhill Potato Co., and Sandhill Produce, Inc., to lease for agricultural purposes approximately 4,525 net irrigated acres and associated dry land corners of farmland (the "Leased Farm"). Approximately 1,089 acres of potatoes were grown upon the farm leased by Lundell from Mr. Jorde in crop year 1992. The remaining approximately 3,436 acres were used by Lundell, or his sublessees, to grow corn, wheat, beans, alfalfa and peanuts. The Farm is primarily valuable and used to grow potatoes, which are its most valuable cash crop. Potatoes can only be grown on the same field once every four years and crop rotation is important. Therefore, it takes an approximately 4,000 acre farm to produce 1,000 acres of potatoes, on an annual basis.

7. On or about July 21, 1992, Ag Services mailed Diamond Hill Farms, Box 7, Alliance, Nebraska, a Notice of Security Interest of Ag Services' security interest in the potatoes grown by Lundell on the Leased Farm which was received by Nielsen on or about July 27, 1992.

8. Ag Services advanced at least $1,611,393.00 for use in growing potatoes during the 1992 season.

9. Nielsen acknowledged that Ag Services' advances and loan were business obligations in conversations with Ag Services, including on January 2, 1992; June 5, 1992; July 30, 1992; September 27, 1992; November 24, 1992, and others. Nielsen had "no problem" with Diamond Hill Farms, Clovis, Inc. paying Ag Services the $50,000.00 of potato proceeds in October, 1992, and assured Ag Services as late as November, 1992, that he saw no problem with Ag Services'

3

getting paid.

10. Lundell likewise acknowledged that Ag Services' advances and loan were business obligations, and assured Ag Services that they would be repaid. Lundell told Ag Services that the loan would be repaid from advance potato contracts totaling $914,077.00 with Frito-Lay, the U.S. Government, Canadian, Borden and Tom's.

11. Lundell and Nielsen each told Ag Services that they had reached an agreement to farm the 1992 Clovis potato farm in early January, 1992, and Ag Services extended substantial credit to Lundell, who was the lessee and farm operator of record. Unbeknownst to Ag Services, defendant Nielsen purported to form a corporation called Diamond Hill Farms, Clovis, Inc. on or about February 24, 1992. Ag Services was not informed of the existence of the Diamond Hill Farms, Clovis, Inc. corporation or that the corporation purportedly leased the potato acreage and operated the farm until December, 1992. Lundell did not inform Ag Services of the existence of the corporation because he didn't think it had been finalized.

12. Although Articles of Incorporation of Diamond Hill Farms Clovis, Inc. were filed with the New Mexico State Corporation Commission on February 24, 1992, the potato business was never operated as a corporation. Neither Nielsen nor Lundell paid any capital contribution to initially fund the corporation. Basically all money paid into the corporation by either individual was in the form of a loan. In actuality, this money did not go to a corporate identity but to the partnership or joint venture that Nielsen and Lundell maintained to grow potatoes.

13. According to Nielsen, the corporation was formed to own the potatoes for the purpose of impairing or cutting off Ag Services' security interest in Lundell's potatoes and thereby evading any obligation of repaying Ag Services' existing loan from potato proceeds.

4

Nielsen knew of Ag Services' existing loan and of its "blanket security agreement" in Lundell's potatoes, and formed the corporation so that the potatoes would be transferred to and owned by the corporation, rather than Lundell.

14. The required formalities of a corporation were not observed or followed by the shareholders, officers, or directors in the operation of Diamond Hill Farms, Clovis, Inc. No formal board of directors' meetings were ever called or held, and no shareholders' meetings were ever called or held. Nielsen and Lundell were also required to contribute payment of the expenses of growing the potato crop on a 50/50 basis. These payments were not capital contributions to the corporation, but individual payments of expenses.

15. Nielsen admits that, as part of his original agreement with Lundell, Nielsen was to keep the Frito-Lay proceeds received from Clovis potatoes as partial reimbursement for his contributions to the corporation. This arrangement evidences a total disregard of the corporate entity from the outset and shows that Nielsen made no contributions to the corporation, but only temporary loans.

16. A checking account was opened in the name of Diamond Hill Farms, Clovis, Inc. on or about June 19, 1992 at First National Bank of Clovis, and withdrawals were done at the whim of its principals, for non-corporate purposes. The first deposit of funds into the Diamond Hill Farms, Clovis, Inc. checking account occurred in late July. Prior to July 31, 1992, Diamond Hill Farms, Clovis, Inc. paid none of the expenses to grow the potatoes, and the expenses were paid by Ag Services or by Nielsen, d/b/a Diamond Hill Farms, or Lundell. Nielsen's payment of these "corporate" expenses shows that he believed them to be personal liabilities.

17. Virtually all of the purported corporate funds were commingled with non-corporate

funds. Approximately $1,777,377.00 of potato proceeds were deposited into the Diamond Hill Farms, Clovis, Inc. checking account after July 31, 1992. Of these, $1,620,000.00 was subsequently commingled with funds from non-corporate accounts, and was transferred from the corporate checking account to Lundell's checking account. Potato expenses were actually paid from Lundell's checking account. Nielsen controlled and commingled the remaining $323,352.00 in Frito-Lay potato proceeds he received with his own funds in his FirsTier account, in disregard of the corporate entity.

18. Nielsen himself did not treat the corporation as a separate entity. Nielsen and his farm manager, Higgins, and other creditors of the business, frequently referred to Lundell and Nielsen as "partners", and Nielsen frequently referred to the business as a "joint venture" or partnership, not a corporation. Higgins referred to Lundell as Nielsen's "partner" in each of the 13 monthly invoices sent to Nielsen from January, 1992, to February, 1993, describing his work. Paragraph 15 of Higgins' management contract with Diamond Hill Farms also referred to the potato business as a "partnership" between Lundell and Nielsen. Nielsen verbally accepted the management contract. Nielsen characterized the Clovis business as a farming "joint venture" in his 1992 personal financial statements submitted to FirsTier Bank. Nielsen relied upon the assets of the joint venture in obtaining credit from his bank. Nielsen's loan officer, S. Anderson, testified that FirsTier relied upon the $399,500.00 assets of the joint venture in extending credit to Nielsen in 1993.

19. The purchase orders for supplies ordered by the Clovis business were on forms that identified the business as Diamond Hill Clovis, and did not indicate a corporate entity.

20. Crop insurance for the potato crops was obtained by and in the name of Terry

6

Lundell, personally, and not for Diamond Hill Farms, Clovis, Inc.

21. On or about May 1, 1992, Higgins signed and filed a certified Farm Report form with the Clovis USDA ASCS office. The Report identified Lundell as the operator and producer of the entire farm, including all potato acreage, and did not state that Diamond Hill Farms, Clovis, Inc. operated the potato acreage. Higgins "certified to the best of my knowledge and belief that the acreage of crops and land uses listed herein are true and correct." On or about July 14, 1992, Higgins signed and filed another Farm Report form with the United States Department of Agriculture ASCS Clovis office. This form also identified Lundell as operator and producer of the farm, including all potato acreage, and excluding certain corn and peanut acreage operated by Eugene and Harold Heflin. Higgins again certified the report was true and accurate. On or about July 17, 1992, Ag Services requested a report of farm bases, yields and planted acreage of the USDA ASCS Clovis office. In response, the USDA sent Ag Services Form ASCS-423 and Form ASCS-424 which identified Lundell as operator and producer of all the potato acreage.

22. No state or federal income tax return was filed by Diamond Hill Farms, Clovis, Inc. in any state for the years 1992, 1993, 1994, 1995, 1996, or 1997. The corporation only filed one initial profit report. Diamond Hill Farms, Clovis, Inc. ceased doing business after the conclusion of the 1992 crop year, and is presently not doing business.

23. Nielsen's and Lundell's wrongful use of the corporation and disregard of corporate entity caused Ag Services' damages and caused its Note to remain unpaid.

24. Nielsen received and kept $323,352.72 in payments from Frito-Lay, Borden and Clover Club from the sale of potatoes grown by the corporation during the 1992 crop year.

25. The corporation also owned $89,019.13 worth of packing inventory at the conclusion

7

of the 1992 crop year. Nielsen received approximately $11,966.00 worth of the packing inventory, sold approximately $30,000.00 worth of the packing inventory to landlord Jeff Jorde, and claims to own personally the remaining packing inventory for a total benefit of $89,000.00.

26. Nielsen's receipt of the $323,352.00 Frito-Lay, Borden and Clover Club potato proceeds, and the $89,000.00 worth of packing inventory constitute an unlawful preference to an officer or director to the damage and detriment of Ag Services, and he must disgorge those proceeds to Ag Services.

27. On December 15, 1992, Bruce Nelson, Ag Services' collection manager, demanded Nielsen repay any of the potato proceeds he had received from the 1992 crop year. At that time, Nielsen knew or should have known that Ag Services was demanding and seeking repayment of the Note from Nielsen, including repayment of any proceeds Nielsen had or received.

28. Ag Services knew that Lundell was using funds covered by its Agriculture Security Agreements to pay other creditors. Ag Services acquiesced in these payments.

29. Nielsen personally controlled and improperly kept and received the benefit of corporate assets totaling $323,352.00 of Frito-Lay proceeds, and the $89,000.00 packing inventory, for a total benefit received of $412,352.00 which was to Ag Services' detriment and has proximately caused Ag Services' damages.

30. Ag Services is entitled to a judgment against Nielsen in the amount of $323,352.72, plus $89,000.00 packing inventory for a total of $412, 352.00, plus interest thereon from January 1, 1993 to present at the rate of 10% per annum, compounded annually, under common law and NMSA 1978 Sections 56-8-3(B) and 56-8-4(A).

31. Lundell testified that he and Nielsen operated as a "partnership" the entire year.

8

According to Nielsen, the Clovis business with Lundell was initially a partnership, and Nielsen prepared a "Clovis Business Concept" document which details the terms of the partnership agreement. On January 21, 1992, Nielsen's notes indicate that the business was a partnership as of that time.

32. As set forth in the previous findings, Nielsen publicly, knowingly and voluntarily held himself out to be Lundell's business associate in their 1992 potato operation, through actions, conduct and words, and also allowed himself to be represented by others as Lundell's business associate, throughout the 1992 crop year, by their actions, conduct and words.

33. In December, 1991 and January, 1992, Ag Services understood that Lundell and Nielsen were in the potato business together based upon Nielsen's, Lundell's and Higgens' representations to Ag Services from December, 1991 to January, 1992, and Ag Services extended credit to the business in reliance upon those representations.

34. In early January, 1992, Nielsen informed Ag Services that he had 30 years of experience in the potato business, and that he was well aware of the problems in the potato industry and market. He stated that his operation had very respectable and profitable years even with low prices. He stated that he had come to a verbal agreement with Lundell on the Clovis operation, and Nielsen was going to be in charge of management, equipment, planting and harvesting of the potato crop. Higgins was going to manage the operation, and they expected profit in the business. Ag Services extended credit to the business in reliance upon the foregoing representations.

35. Neither Nielsen nor Lundell informed Ag Services that a corporation was set up to

9

operate Lundell's and Nielsen's farm until December, 1992.

36. Ag Services is entitled to damages in *quantum meruit* because Nielsen knew of Ag Services' loan and expectation of repayment of its loan, yet Nielsen wrongfully kept the $323,352.72 of proceeds from the business, and the $89,000.00 worth of packing inventory. Nielsen is not entitled to retain those benefits, even if Ag Services' security agreement with Lundell is invalid as to some of the acreage due to a mistaken legal description in the Security Agreement or because of multiple subleases of the farm land or due to the formation of Diamond Hill Farms, Clovis, Inc. during the season or for other reasons.

37. Ag Services filed its Complaint against defendants on November 22, 1996. Lundell's note to Ag Services was not due and payable until December 15, 1992. Consequently, Ag Services' Complaint was timely filed because it was filed within four years of the date of default of the Note.

38. In November, 1992 Nielsen again informed Ag Services that there were plenty of potato proceeds remaining and that Ag Services would be paid. Nielsen led Ag Services to believe that he and Lundell just needed to meet to divide the proceeds and write checks.

39. On December 15, 1997 Nielsen told Ag Services for the first time that the Clovis potato operation was actually operated by a separate corporation called Diamond Hill Farms, Clovis.

40. Ag Services lacked knowledge until some time after November 23, 1992, that (1) there were few potato proceeds left, (2) that there was no separate Nielsen operation in Clovis; (3) that Nielsen's alleged sublease was a backdated, altered and sham document; (4) that the Clovis potato operation was actually operated by Nielsen and Lundell as one unit at all material

10

times; (5) that Nielsen used Ag Services' loan funds on all of the potato acreage, or (6) that the purported corporation was a sham and the operation was actually operated as a joint venture or partnership.

41. Ag Services lacked knowledge that a corporation was involved, that the Lundell Note would be unpaid or that no proceeds would be paid Ag Services until after November 23, 1992. Therefore, Ag Services' cause of action for piercing the corporate veil, partnership by estoppel, or *quantum meruit*, did not accrue until sometime after November 22, 1992.

## Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter of this case.

2. The corporate entity of Diamond Hill Farms, Clovis, Inc. shall be and is disregarded because the corporation was formed and is being used for improper or wrongful purposes, as set forth in *Garcia v. Coffman*, 124 N.M. 12, 946 P.2d 216 (1997). The corporate entity did not exist at the time Lundell and Nielsen agreed to the 1992 potato venture or when Ag Services extended substantial credit to their business and was formed thereafter for the wrongful purpose of avoiding such debt or obligation, and perpetuating injustice upon Ag Services.

3. The financial structure of Diamond Hill Farms, Clovis, Inc. was also a sham, and the corporation was vastly undercapitalized. Lundell and Nielsen disregarded the corporate entity themselves and did not observe or follow corporate formalities, the corporation was controlled and dominated by Nielsen, and was operated as his alter ego.

4. Nielsen and Lundell each represented to Ag Services and others that they were in business together in December, 1991 and January, 1992, and Ag Services extended substantial credit to Lundell, in reliance thereon. Nielsen's and Lundell's 1992 potato business in Clovis was

11

operated as a partnership or joint venture, with all expenses and revenues pooled at the end of the year, and with each principal liable for the profits or losses. Nielsen, by virtue of his representations, actions and conduct, is estopped from denying he was Lundell's partner in the 1992 Clovis operation.

5. Nielsen is personally liable to Ag Services for repayment of the $323,352.00 of Frito-Lay, Clover Club and Borden proceeds, and the $89,000.00 of packing inventory, for a total of $412,352.00, plus interest thereon at 10% per annum, compounded annually, from January 1, 1993 until paid. This sum includes the $162,000.00 awarded by the jury.

6. Ag Services' claims are not barred by the statute of limitations, waiver, estoppel or laches or any other affirmative defenses due to defendants' aforesaid misrepresentations, misconduct, concealment of material facts and other misconduct.

7. Ag Services is entitled to its costs of litigation.

8. In the event this matter is appealed, and upon appeal, the appellate court finds that this Court, in determining equitable claims and relief, is bound by the jury's $162,000.00 damage award against Diamond Hill Farms, Clovis, Inc. for conversion, then the Court finds as follows: Defendant Nielsen should be held personally liable to Ag Services under piercing the corporate veil, partnership by estoppel and in *quantum meruit* payment of the $162,000.00 verdict against Diamond Hill Farms, Clovis, Inc., plus interest thereon at the rate of 15% per annum, compounded annually, from January 1, 1993 until paid.

_John Edwards Conway_
CHIEF UNITED STATES DISTRICT JUDGE